FILED

2016 Mar-29  PM 02:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **ALABAMA SPECIALTY PRODUCTS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No.: 1:14-CV-2070-VEH** |
| | ) | |
| **SPECIAL METALS CORPORATION, acting through its division, SPECIAL METALS WELDING PRODUCTS COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION

A company specializing in the metallurgic arts, Alabama Specialty Products, Inc., ("ASPI") has sued Special Metal Corporation ("SMC"), and the issue in this case is whether it was unlawful for SMC to "put the screws" to ASPI during contract negotiations. Defendant SMC has moved for summary judgment, claiming there was nothing wrong with striking a deal on terms extremely favorable to SMC, even though ASPI was stuck between the hammer and the anvil. I agree with SMC; the heat they applied was insufficient to melt down the iron bonds of the contract with ASPI. The defendant's motion for summary judgment will be **GRANTED**.

## PROCEDURAL BACKGROUND

ASPI brought this action against defendant SMC on October 27, 2014. (Doc. 1). The complaint properly invoked this court's diversity jurisdiction. *See* 28 U.S.C. § 1332. ASPI alleged that SMC had breached express and implied warranties and defrauded ASPI. (*Id.*). SMC filed a motion for summary judgment under Rule 56 on October 16, 2015. (Doc. 26). The court referred the parties to mediation on October 28, 2015, although the referral was amended on November 4, 2015 to order ASPI to respond to the motion for summary judgment. (Docs. 29 and 32). ASPI filed its response on November 16, 2015, and then the mediation began. (Doc. 35). On January 15, 2016, the parties informed the court that the mediation had failed, *see* doc. 36, and SMC filed its reply brief on January 29, 2016. (Doc. 38). The motion is now under submission and ripe for decision.

## FACTUAL BACKGROUND[1]

ASPI works in a highly specialized industry which uses lasers to clad metal alloy to steel tubes that are used in industrial applications. (Doc. 28-1, No. 2). ASPI has developed a "proprietary method" of utilizing lasers to clad the alloy to the steel

---

[1] This factual background does not include facts that are irrelevant to the resolution of this motion. I assemble the background by first crediting all undisputed facts. For disputed facts that are resolved unambiguosly by the evidence, the version supported by the evidence gets credit. If a fact is disputed, and the evidentiary support is ambiguous, ASPI's version of the fact is credited because it is the non-movant. Finally, a good bit of this recitation of facts is quoted directly from the briefs; the parties have recited the facts succinctly.

tubes. ASPI's method allows for a reduced thickness and superior product when compared to a traditional welding process. The nature ASPI's cladding process requires changes based upon the different alloys that are used, meaning that the process varies considerably from one alloy to another. (*Id.*).

On January 25, 2012, ASPI entered into a contract with Chicago Tube and Iron ("CTI") whereby ASPI would perform overlay work—applying alloy metal to existing metal through welding—on stainless steel boiler tubes for CTI which would then be sold to Southern Company. (Doc. 28-2). CTI/Southern Company specified and required that the overlay be applied with Inconel 72M wire ("72M wire") manufactured by SMC. (*Id.*). ASPI is unaware of the process by which SMC was selected to supply the 72M wire. (Doc. 28-1, No. 3).

In early 2012, ASPI issued a Purchase Order for 72M wire totaling approximately 22,000 pounds and including only the specifications of 1) the type of wire ASPI wanted to purchase; 2) the diameter of the wire; and 3) the spool size of the wire. ASPI signed an Order Acknowledgment for this Purchase Order. (Doc. 28-3, ¶18). To fulfill ASPI's purchase order, SMC drew the 72M wire from two separate and different heats, WA0044FK (approximately 1,000 lbs.) and WA0048FK (approximately 22,000 lbs.). (*Id.*, ¶ 19). SMC delivered the approximately 22,000 lbs. of 72M wire to ASPI. (*Id.*, ¶21).

3

The 72M wire supplied by SMC had inconsistencies that made it difficult to laser clad the wire to the boiler tubes. (Doc. 35-1, ¶¶ 10; 20–21). The 72M wire supplied by SMC to ASPI was inconsistent from spool to spool, even when the spools came from the same heat number. ASPI notified SMC of the problems with the 72M wire during the time frame when SMC was still supplying the wire to ASPI. (*Id.*, ¶¶ 11-12).

Because of these problems, ASPI returned the wire to SMC in September 2012. (*Id.*, ¶ 13; 28-3, ¶ 22). A majority of the wire returned by ASPI, more than 20,000 lbs., was wire drawn from Heat number WA0048FK. (Doc. 28-3, ¶ 23). SMC credited or refunded the cost of the wire to ASPI. (*Id.*, ¶ 24).

On April 10, 2013 (more than 6 months after the return of more than 20,000 lbs. of 72M wire), ASPI approached SMC and inquired about re-buying the wire it had returned. (*Id.*, ¶ 27).  And on the same day, ASPI issued a Purchase Order for 22,000 lbs. of the 72M wire with the only specification being 1) the type of wire APSI wanted to purchase, 2) the diameter of the wire; and 3) the spool size of the wire and now specifying that the wire come from Heat number WA0048FK—the exact same wire that was returned. (*Id.*, ¶ 28). SMC delivered the remaining wire it still had from Heat WA0048FK (some of the wire had been used for independent testing and some was sold to Foster Wheeler) per the Order Acknowledgment. (*Id.*,

¶ 31). The 72M wire shipped to ASPI had not been altered or changed in any way from the time it was return to SMC until the "re-purchase." (*Id.*, ¶ 32).

In consideration for the risk SMC would take by potentially having the same wire returned twice, ASPI issued a release to SMC stating: "Alabama Specialty Products, Inc. will not hold Special Metals Corporation liable for any indications resulting from our laser cladding of Special Metals Inconel 72 M material." (*Id.*, ¶ 29). ASPI only agreed to this condition because SMC refused to sell ASPI any further 72M wire until ASPI issued the release. (Doc. 35-1,  ¶ 18). The language in the release was requested by SMC. (*Id.*).

ASPI informed SMC that 72M wire was required for this job by CTI. At all times relevant hereto, SMC was aware that ASPI could not get acceptable wire from another manufacturer, because there is no alternative source for the wire. (*Id.*, ¶ 19).

As a result of the discrepancies and inconsistencies in the 72M wire, the laser cladding of the wire to the boiler tubes led to inconsistent results in the quality testing.  Specifically, CTI required dye penetrant testing on the boiler tubes. (*Id.*, ¶ 20). As a result of the inconsistent test results, CTI required ASPI to provide additional testing, in the form of more expensive Eddy Current testing, and remedial work on the tubes that did not satisfy the testing requirements. (*Id.*, ¶ 21) The additional testing and remedial work caused ASPI to incur substantial expense. (*Id.*,

¶ 22).

SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The party seeking summary judgment bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment. *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).

DISCUSSION

SMC has presented a legion of grounds for summary judgment, but all it takes is one—its first argument. In particular, SMC points to the release executed with the repurchase as evidence that the whole action is due to be dismissed. ASPI responds that the release was the product of economic duress, suggesting that because SMC knew that ASPI required 72M wire to complete the job with CTI, and SMC knew that

6

ASPI could only obtain the wire from SMC, the release is voidable. ASPI agrees that it signed the release containing the quoted language, doc. 35 at 5, and they do not dispute that it would have the effect SMC suggests. Since I conclude the release was not the product of duress, the motion for summary judgment will be **GRANTED**.

## I.      Governing Law

A party who seeks to be excused from a contract on the ground that he only entered it under duress may do so by proving "(1) wrongful acts or threats; (2) financial distress caused by the wrongful acts or threats; (3) the absence of any reasonable alternative to the terms presented by the wrongdoer." *Wright Therapy Equipment, LLC v. Blue Cross and Blue Shield of Ala.*, 991 So. 2d 701, 707 (Ala. 2008). "[A] question of duress is ordinarily a matter for the jury," *Newburn v. Dobbs Mobile Bay, Inc.*, 657 So. 2d 849, 851 (Ala. 1995), but "this tenet does not mean that a claim of economic duress can never be resolved on summary judgment." *Edwards v. Kia Motors of America, Inc.*, 486 F.3d 1229, 1235 (11th Cir. 2007) (citing *Wilson v. S. Med. Ass'n.*, 547 So. 2d 510, 514 (Ala. 1989)).

The defense "applies only to special, unusual, or extraordinary situations in which unjustified coercion is used to induce a contract, as where extortive measures are employed, or improper or unjustified demands are made, under such circumstances that the victim has little choice but to accede thereto." *Int'l Paper Co.*

*v. Whilden*., 469 So. 2d 560, 563 (Ala. 1985) (quotations and citations omitted). Further, "[i]t is never duress to do that which a party has a legal right to do," *Choksi v. Shah*, 8 So. 3d 288, 293–94 (Ala. 2008) (citation omitted), and "merely taking advantage of another's financial difficulty is not duress." *Ponder v. Lincoln Nat. Sales Corp.*, 612 So. 2d 1169, 1171 (Ala. 1992).

According to the Eleventh Circuit, the causation principle in the second element requires that the wrongful act be performed "to induce [the party alleging duress] to execute the [r]elease." *Edwards*, 486 F.3d at 1236. The Alabama courts could be a little clearer on the line between wrongfulness and causation, *see*, *e.g.*, *Newburn*, 657 So. 2d at 852; *Int'l. Paper*, 469 So. 2d at 562–63, but *Edwards* appears to be supported by the Alabama cases. *See Newburn*, 657 So. 2d at 852; *Int'l. Paper*, 469 So. 2d at 562–63. Additionally, the Eleventh Circuit's formulation reflects a rule with widespread acceptance. *See* 28 RICHARD A. LORD, WILLISTON ON CONTRACTS § 71:43, at 579–80 (3d ed. 2003) ("[T]he person alleging financial difficulty must also allege that it was contributed to or caused by the one accused of coercion."); *Cabot Corp. v. AVX Corp.*, 863 N.E.2d 503, 512 (Mass. 2007) ("Cabot did not create the situation—it merely took advantage of it.").

The Alabama courts <u>are</u> clear on one point, however, whether they call it causation or wrongfulness: a party "commit[s] no wrongful act when, under the

prevailing market conditions at the time, it engage[s] in negotiations for better [contract] terms." *Ponder*, 612 So. 2d at 1171. That the economic hardship must be the result of the wrongful act is logical; were it otherwise, distressed parties to contracts could obtain *carte blanche* to void any agreement entered into under the "duress" of a harsh market. *See also* 28 RICHARD A. LORD, WILLISTON ON CONTRACTS § 71:7, at 450 ("[H]ard bargaining . . . is desirable in our economic system and should not be discouraged by the courts." (punctuation omitted)).

## II.   No "Wrongful Act" Has Been Shown

A threshold matter is which act, exactly, ASPI believes was wrongful. ASPI complains in its brief that "SMC refused to supply any additional wire until ASPI provided the release language," doc. 35 at 5, and "SMC was aware that ASPI needed the [72 M] wire in order to complete its contract. With that knowledge, and after ASPI had raised complaints about the quality of the wire, SMC refused to provide any more wire until the release was signed." (*Id.* at 6). There are two possible "wrongful" acts: 1) SMC's insistence on a release when it knew ASPI needed the wire, and had raised complaints about the quality of the wire, before SMC would sell, or 2) SMC's refusal to sell on the previous terms. I will get to both, but because the first is a specific instance of the second, I will address it first.

The result dictated by these facts is clear, but to see why, it is best to explain

why <u>any</u> reasonably prudent businessman would seek precisely the release SMC did. The explanation will be by way of hypothetical: George Bluth has a contract with the Balboa Yacht Club to build a fence around the club's golf course, and Balboa requires that Bluth obtain the fencing materials from Lucille Austero. Bluth buys the materials from Austero, finds them not to be suitable for the project and returns them to her. Some time passes, and Bluth finds himself stuck. He could breach by buying the materials from another supplier, by not completing the fence, or by building the fence with Austero's inferior materials. So Bluth approaches Austero and asks to buy back the precise fencing that he had previously returned, because Austero was the only person from whom he could buy, and he had an impending deadline with Balboa. He tells Austero these things.

Austero is a sophisticated businesswoman,[2] and she knows that Bluth's complaints about the fencing probably have not evaporated. So there is more than a shadow of a chance that if Bluth uses her materials when he has already complained about their quality, Bluth will be embroiled in a dispute with Balboa, and there is therefore a good chance, as Bluth's supplier, she will be too. Of course, this is on top of the risk that Bluth will return the fencing a second time.

---

[2]  For purposes of this hypothetical, she has changed her mind since saying "I love the Bluths." *See* ARRESTED DEVELOPMENT: QUEEN FOR A DAY (Fox television broadcast Jan 23, 2005).

Being rational, Austero would consider these risks in deciding whether to make a deal. And nothing requires that Bluth and Austero make a deal, but if they did make one, Austero would want to ensure that the consideration she receives mitigates the risk of return and the risk of litigation. One way of accomplishing this would be to require a release of liability over the fencing as a condition precedent to making a deal.

I spun all that out to highlight something important—SMC's insistence on the release was perfectly reasonable as a matter of business logic, and that makes it very, very, very hard to say that asking for the release was a "wrongful act." I cannot say it was "special, unusual, or extraordinary," nor was it "extortive . . . improper, or unjustified." *Int'l Paper*, 469 So. 2d at 563. To the contrary, it would have been comically naïve of SMC not to insist on such a release, where they knew ASPI was under the gun from CTI, risking breach with CTI, and had previously claimed SMC's materials were unsuitable for the project.

As for the alternative "wrongful act," the refusal to deal on previous terms, SMC could have refused to deal at all with impunity. *See Choksi,* 8 So. 3d at 293–94 (it is never wrongful to exercise one's legal rights); *cf. Guillot v. Beltone Electronics Corp. of Chicago*, 540 So. 2d 648, 650 (Ala. 1988) (economic duress is not an independent cause of action). Instead, SMC gave ASPI what it asked for, albeit for

11

heightened consideration in light of the risk in the situation, and "merely taking advantage of another's financial difficulty is not duress." *Ponder*, 612 So. 2d at 1171.

In a very similar case, a New York State court explained as well as anyone could why this scenario is not one giving rise to duress—just substitute "wire" for "hops:"

> The plaintiff was under no duty or obligation to do business with defendant and could have refused, arbitrarily, to do business with it, or if it decided to do business with defendant could name its own terms. Defendant could have declined to accept them; it was under no obligation to accept, other than its need to have the hops which it could not obtain elsewhere. Driving a hard bargain in the circumstances is not the type of duress which may be availed of as a ground for avoiding entering into a contract and liability thereunder.

*Bethlehem Steel Corp. v. Solow*, 405 N.Y.S.2d 80, 82 (N.Y. App. Div. 1978) (quoting *Hugo v. Lowei, v. Kips Bay Brewing Co.*, 63 N.Y.S.2d 289, 290 (N.Y. Sup. Ct. 1946)).

All of this is not to say that I believe it is impossible that price (or non-price consideration) gouging could constitute a wrongful act, but the facts taken in the light most favorable to ASPI do not even come close to price gouging, much less a wrongful act. So I will reject ASPI's suggestion that charging a higher price (or requiring additional consideration), "alone," creates a jury question on duress. (*See*

doc. 35 at 6). It is ASPI's task to show there is a triable issue on wrongful behavior, *see Penick v. Most Worshipful Prince Hall Grand Lodge F & A M of Alabama, Inc.*, 46 So. 3d 416, 432 (Ala. 2010), which would require—at a minimum—explaining why facially reasonable behavior is wrongful by applying facts to law, rather than reciting the elements of economic duress and offering an *ipse dixit* that the jury should decide this question. "[T]he onus is on the parties to formulate arguments." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

## II.   Nor Did SMC's Actions Cause ASPI's Predicament

This second element is more succinctly disposed of. Because the <u>wrongful act</u> must induce the party to accede to the release, and the pressure that induced ASPI to acquiesce to the release to came from the contract with CTI that ASPI voluntarily entered, the second element is not satisfied. Sometimes you have to spend money to make money, but that does not mean you have been subjected to duress. I need not reach the third element, the presence (or absence) of reasonable alternatives.

### CONCLUSION

The duress defense voids contracts *de facto* lacking in mutual assent; it is not a quixotic mechanism to force kind dealing in the face of supply shortages or business acrimony. The motion for summary judgment will be **GRANTED** by separate order.

13

**DONE** and **ORDERED** this 29th day of March, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge